403 So.2d 551 (1981)
Sue G. CAPUTO and Warren J. Caputo, Her Husband, Appellants,
v.
J. Champneys TAYLOR, Appellee.
No. SS-404.
District Court of Appeal of Florida, First District.
September 4, 1981.
Rehearing Denied October 2, 1981.
Thomas M. Baumer and Dana G. Bradford, II, of Mahoney, Hadlow & Adams, Jacksonville, for appellants.
James E. Cobb and Mary Bland Love, of Matthews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Jacksonville, for appellee.
BOOTH, Judge.
This cause is before us on appeal from a judgment entered on a jury verdict for the defendant in a suit for personal injury allegedly resulting from the negligence of the defendant in failing to diagnose and treat cancer. On appeal to this court, plaintiffs contend that the trial court erred in failing to give certain requested jury instructions and in refusing to allow an expert witness, Dr. John Feegel, to testify concerning the standard of care applicable in the case.
The facts are that, in August, 1976, plaintiff Sue Caputo had a scheduled appointment with defendant Taylor for a gynecological examination. Mrs. Caputo testified that, at the time of the examination, she advised defendant of the presence of a lump or growth in her right breast and requested that he examine it. She testified that defendant did examine the growth in 1976 but specifically advised her that it was not malignant *552 and no treatment was needed. Mrs. Caputo further testified that, at her next annual examination on September 19, 1977, she again advised defendant of the growth, that defendant examined it, but that this time he made arrangements for further testing and referred her to a surgeon. The tests determined that the growth was malignant and that it had metastasized or spread to the lymphatic system. A modified radical mastectomy was performed on September 26, 1977, followed by radiation therapy and surgical procedure for breast reconstruction.
The complaint alleged negligence of the physician in (1) failing to diagnose the malignancy; (2) failing to recommend or perform further tests to determine the nature of the growth or to follow its development; and (3) failing to treat so as to remove or arrest spread of the growth. The complaint alleged the following:
9. As a direct and proximate result of the defendant's negligence, plaintiff Sue G. Caputo took no further action with respect to the growth until her subsequent visit to the defendant on September 19, 1977 for her annual gynecological examination, as a result of which the malignant growth was permitted to further spread unchecked throughout the breast area, and into adjacent tissue in the chest area, and in addition into the lymphatic system, necessitating the extensive surgical procedures for its treatment and removal occasioned by such spread.
10. As a result of the defendant's negligence, and the consequences thereof, plaintiff, Sue G. Caputo suffered extensive pain, incurred medical expense in the treatment of the illnesses and/or injuries resulting therefrom, suffered physical handicap and her working ability was impaired; the injuries are either permanent or continuing in nature and plaintiff Sue G. Caputo will suffer the losses and impairment in the future.
In addition, plaintiff's counsel was permitted to argue without objection that plaintiff suffered "loss of chance" for early treatment and reduced life expectancy.
Defendant denied that plaintiff had advised him of any abnormality with respect to her breast in August, 1976, and denied that any growth or lump was present in 1976. He relied on his patient record of the 1976 examination. Defendant's testimony was supported by two nurses, one of whom was present during Mrs. Caputo's examination. Both nurses testified Mrs. Caputo told them in September of 1977 that she had had the lump in her breast for three to four months. Further, the testimony of the nurse of Dr. Williams, the surgeon who diagnosed plaintiff's malignancy in 1977, as to her conversation with Mrs. Caputo, would support a jury finding that, although plaintiff discovered the lump in 1976, she failed to tell her doctor for over a year because she feared possible breast removal and resulting detriment to her marriage.
Mrs. Caputo's version of the facts as to existence of the lump in 1976 was supported by the testimony of her husband, her twin sister and her husband's former wife, all of whom stated that they felt the lump, approximately one inch long, in 1976 prior to her visit to the doctor. The doctors who examined Mrs. Caputo a year later in 1977 testified the lump was one inch (2.5 centimeters) long.
The case was tried to the jury in September, 1979. Plaintiff's expert and her operating physician, Dr. Phillips, testified that there was no way to tell within reasonable medical probability whether the malignancy he encountered in the operation of 1977 had been present for one year prior to the operation; that he could not tell at what point in time the cancer cells spread from the breast area to the lymph nodes; and that, although the growth had probably been malignant from the beginning, there was no way to determine at what point it metastasized since what he found in the 1977 operation was consistent with a growth that had started either three months before the operation or a year before the operation. This testimony was essentially the same as that given by all other experts who testified. Dr. Williams, a surgeon specializing in cancer *553 surgery, testified for the plaintiff that the lump "could have been there 10 years; it could have been there 10 weeks." He further testified:
[T]here is a great variation in the growth rate of breast cancers. It [the lump] certainly could have come within a year without any trouble at all. Some of them can come explosively within a matter of several weeks, inflammatory-type breast cancers. So there is nothing contradictory about it. It could have been nothing a year ago and could have been what I found within that time.
All experts testifying, including the defendant, were unanimous in their testimony concerning the standard of care required for the treatment of unknown lumps or growths in the breast and the importance of prompt diagnosis and treatment.
Dr. Feegel, a board-certified pathologist, was not allowed to testify as to the standard of care in treating potential breast cancer patients. He was allowed, however, to testify to various other matters. Dr. Feegel gave his opinion that the lump in question existed in 1976, but he admitted on cross-examination that this testimony was based on the fact that Mrs. Caputo said she felt it then. The most Dr. Feegel was willing to state as to the existence of the lump a year before its removal was: "I think it's  there are some bases for an opinion that it [the lump] was probably palpable a year earlier based on its microscopic appearance and its size." He further testified, however:
Q Based upon reasonable medical probability, Doctor, in your experience and practice and what you have told us today as to the effects of early care and treatment of the patient, would your prognosis for Mrs. Caputo be different had the mass been removed a year earlier than it was removed?
A Well, the difficulty with an answer for that is that it really depends on whether that early removal includes some statement as to the degree of spread at that time.
Q Do you know what the degree of spread was in 1976?
A No.
....
Q There is no way you can look at those nodes in those slides in front of you and tell whether or not on August 12, '76, they were cancerous or not?
A That's correct.
Our review of the testimony and record shows that the jury, in resolving the conflict in the evidence and weighing the credibility of the witnesses, could have based its verdict on a determination that the defendant and his witnesses were more credible and that there was, in August, 1976, no lump or mass in the plaintiff's breast or, if there was a lump in 1976, it was not mentioned by the patient, and defendant was not negligent in failing to discover it. Beyond these bases for support of the verdict, there also appears a lack of evidence that the damages claimed were caused by the negligent failure of the defendant to detect the malignancy if it did exist prior to September, 1977. This evidentiary failure is largely due to the lack of medical knowledge as to the origin, rate of growth and spread of cancer. There is no claim that defendant was responsible for the origin of the cancer.
The damages sought, quoted supra, are those claimed to have resulted from the year of nondiagnosis and nontreatment and are predicated on the assumption that during that year the malignancy spread. No witness, however, was able to testify in support of that assumption. Although all experts agreed that early diagnosis and treatment are of utmost importance in cancer cases, none was able to say with reasonable medical probability that the spread of plaintiff's cancer occurred after August, 1976, when defendant allegedly failed to diagnose it. There was no testimony that the operation and treatment of plaintiff's malignancy or the affect on her life expectancy were different in 1977 than they *554 would have been had the lump been discovered in 1976.[1]
Plaintiffs contend that the trial court should have given the Florida Standard Jury Instruction on contributing cause[2] and on aggravation of a preexisting disease.[3] We find no error in failing to give these requested charges because, as previously explained, there was no evidence that defendant's actions or inactions, even if negligent as alleged, contributed to or aggravated Mrs. Caputo's condition.
We also find no error in the trial court's ruling that Dr. John R. Feegel, Pathologist, was not qualified to testify as to the standard of proper care and treatment of potential breast cancer patients. Section 768.45(2)(c), Florida Statutes, provides that a doctor may testify as to the expected standard of care for a given health care provider if he is a similar health care provider or if it is established to the satisfaction of the court that he possesses sufficient training, experience and knowledge to provide such expert testimony as to the acceptable standard of care in a given case. Dr. Feegel is not a "similar health care provider" since he is not a gynecologist. The question then became one for the trial court as to whether the witness had sufficient training and knowledge to allow him to testify as to an acceptable standard even though he is not a similar health care provider. We have reviewed the record on this point and find that the trial court did not abuse its discretion in refusing to allow Dr. Feegel to testify to an acceptable standard. It is difficult to see that the plaintiff was harmed, in any event, by the trial court's ruling on Dr. Feegel since all experts who testified for both parties, including the defendant, agreed on the acceptable standard of care, the same standard that Dr. Feegel would have testified to, and this was not an issue in the case.
The judgment below is, accordingly, AFFIRMED.
ROBERT P. SMITH, Jr., C.J., and SHAW, J., concur.
NOTES
[1] On this state of the evidence, a jury determination of causation could only be based on speculation, and a directed verdict for the defendant could properly have been granted.
[2] Fla.Std.Jury Instr. (Civ.) 5.1(b).
[3] Fla.Std.Jury Instr. (Civ.) 6.2(b).